ELDER et al. v. McCLASKEY et al.

(Circuit Court of Appeals, Sixth Circuit. May 13, 1895.)

No. 224.

1. ADVERSE POSSESSION—LIMITATION OF ACTIONS.

Under the Ohio statute which provides that "an action for the recovery of the title or possession of real property can only be brought within twenty-one years after the cause of action accrues" (Smith & B. Rev. St. § 4977), and the construction placed thereon by the supreme court of the state, an open, notorious, exclusive, and adverse possession of land for 21 years, with or without color of title, whether continuous in the first possessor, or tolled in persons claiming under him, and whether with or without knowledge of the existence of another title, confers upon the original possessor, or those claiming under him, an indefeasible title in fee.

2. COURTS—FOLLOWING STATE DECISIONS—RULE OF PROPERTY.

State decisions construing the state statute of limitations in respect to real property, and declaring what constitutes adverse possession, and the effect thereof when continued for the period of limitation, constitute a rule of property binding on the federal courts of law and in equity in adjudicating upon titles to lands within that state.

3. TENANCY IN COMMON—DISSEISIN.

The rule that a tenant in common in possession is presumed to hold in the right of his cotenants, as well as himself, until notice is brought home to them of an intention to disseise them, has no application to any case except where the possession was avowedly begun as a tenant in common, or under a deed which defined his title as such. 47 Fed. 154, reversed.

4. SAME—WHEN ENTRY IS AN OUSTER.

An entry and possession under general warranty deeds in fee simple, with claim of exclusive ownership in fee, is an ouster of all other persons claiming an interest in the land at and from the time they have a right of entry, and it is immaterial that such deeds actually vest only a life estate or an undivided interest. The extent of the estate purporting to be conveyed characterizes the entry and subsequent possession. 47 Fed. 154, reversed.

5. SAME—OUSTER BY ADVERSE POSSESSION.

Where one having a life estate executes deeds in fee simple, with covenants of general warranty, and the grantees take possession thereunder, claiming exclusive ownership in fee, and continue such possession in the

same manner after the death of the life tenant, such continued possession is an ouster of persons claiming to be cotenants, whose right of entry accrued on the death of the life tenant.  47 Fed. 154, reversed.

**6.  SAME—PURCHASE OF OUTSTANDING INTEREST.**

One in possession under a deed which purported to convey a fee-simple title, but which in fact vested only a life estate (because the grantor had no more), procured another to buy in undivided interests in remainder claimed by certain heirs, and afterwards took from such purchaser a deed conveying a fee-simple title, in language necessarily implying that there were no other heirs to the property, other than those whose interests were thus conveyed. *Held* that, whether the possession of the grantee was thereafter to be referred to this deed or to his original deed, his claim of title was wholly inconsistent with, and necessarily excluded, any implied admission or avowal that he was holding in common with or for the benefit of any other persons, who might claim an interest in remainder by heirship or otherwise.  47 Fed. 154, reversed.

**7.  SAME—EVIDENCE OF ADVERSE CLAIM—CONVEYANCES.**

It seems that a tenant in common of one continuous tract of land, who has entered thereon under color of title to exclusive possession, may show subsequent conveyances by him in fee, to others, of a much larger part of the tract than the share which he is admitted by his cotenants to have, for the purpose of establishing that his possession of the remainder was inconsistent with and adverse to the claim of such cotenants.

**8.  SAME—ADVERSE POSSESSION—HOW SHOWN.**

A grantee entered into possession under a deed purporting to convey a fee-simple title, but in fact conveying only a life estate.  Thereafter, and before the termination of the life estate, he executed mortgages in fee of the whole tract.  He also brought a bill to quiet title, and averred therein his exclusive ownership in fee of the property.  In a subsequent suit brought by him to perpetuate testimony, he made the same averment, except as to a small interest, which he first contested and then bought in.  Shortly after the falling in of the life estate he gave mortgages in fee simple, covenanting that his title was clear, free, and unincumbered.  In an action of ejectment afterwards brought against him by certain heirs to recover the whole tract, he pleaded not guilty.  He also bought in the title claimed by certain heirs, and took deeds reciting that he was holding adversely.  *Held*, that these acts were sufficient to show that he claimed possession adverse to all the world.

**9.  SAME—OUSTER OF COTENANT.**

The possession of a tenant in common, who entered as such, may become adverse to his cotenants without giving to the latter actual notice of their ouster or disseisin.  He must "bring home" to them the knowledge of the disseisin, but he may do this by conduct, the implication of which cannot escape the notice of the world about him, or of any one who, though not resident in the neighborhood, has an interest in the property, and exercises that degree of attention in respect to it which the law presumes in every owner.  47 Fed. 154, reversed.  In re Broderick's Will, 21 Wall. 503; Webster v. Society, 50 Ohio St. 1, 33 N. E. 297; State v. Standard Oil Co., 49 Ohio St. 137, 30 N. E. 279; Williams v. Coal Co., 37 Ohio St. 583; Howk v. Minnick, 19 Ohio St. 462; Hogg v. Beerman, 41 Ohio St. 81; Youngs v. Heffner, 36 Ohio St. 232,—followed.  Chandler v. Ricker, 49 Vt. 128; Zeller's Lessee v. Eckert, 4 How. 289,—distinguished.

**10.  ADVERSE POSSESSION—ESTOPPEL—PURCHASE OF OUTSTANDING TITLE.**

A vendee is not estopped to deny the title of his vendor, and a person in possession under a claim of complete ownership has the right to fortify his title by the purchase of any real or pretended titles without thereby holding possession in subordination to them.

**11.  SAME.**

Whether the acceptance of a deed of an outstanding interest by one in possession shall affect his adverse possession depends on all the cir-

cumstances surrounding it. Generally, if his possession began under a claim of title in fee, the purchase of another title is not to be regarded as a change of attitude.

12. SAME—UNKNOWN HEIRS.

Even if the purchase by one in possession of the outstanding interests of certain heirs is to be construed as an admission that the vendors had title superior to that of the vendee, and as controlling evidence of an intention on the part of the vendee to claim under the title thus acquired, the deeds cannot be held to be admissions of title in other heirs, and as evidence of an intention to claim under them, where the existence of such other heirs was not at the time known or suspected by the purchaser. A claim of title under an ancestor is not a claim of title under the heir, when the heirship was not known or admitted; and acquiescence in the title of one heir is entirely consistent with a possession adverse to a coheir, when the fact of the relationship between the two is unsuspected, or is the point in dispute. 47 Fed. 154, reversed.

13. SAME.

Persons in possession under a notorious, distinct, and specific claim of title in fee are not required, in order to make their possession adverse to all the world, to show that they have used due diligence in hunting up unknown heirs, and have failed to discover them.

14. LIMITATIONS OF ACTIONS—COMMENCEMENT OF SUITS IN DIFFERENT COURTS.

The bringing of one action does not stop the running of the statute of limitations, when pleaded in a later action in respect to the same property. Therefore, the beginning, before the expiration of the limitation period, of a partition suit in one court, does not stop the running of the statute, so as to avail the complainants in another partition suit instituted in another court after the period of limitation had expired.

15. SAME—DISABILITY OF COVERTURE.

In a statute making the period of limitation in respect to real estate 21 years, with a saving to married women of 10 years after the removal of the disability of coverture (Smith & B. Rev. St. Ohio 1890, §§ 4977, 4978), the saving clause has no application to a case in which the disability was removed more than 10 years before the expiration of the 21 years.

16. EQUITY JURISDICTION—WAIVER OF OBJECTIONS—APPEAL.

In a case usually cognizable in equity, as a suit for partition, an objection that, for a special reason, the rights of the parties should first be established at law, may be waived, and is waived, so far as an appellate court is concerned, by a failure to object to the equity jurisdiction in the court below.

## On Petition for Rehearing.

17. APPEALABLE DECREES—FINALITY—STATE PROCEDURE.

The question of the finality of a decree, for purposes of appeal or otherwise, in the federal courts, is not affected by the procedure in the state courts, but must be governed by the statutes of the United States and the procedure and rules of decision in the United States courts.

18. SAME—PARTITION DECREE.

In a partition suit a decree was entered settling the various undivided interests of the parties, finding that the parties demanding it were entitled to partition, and appointing commissioners to make the same, with authority to survey and allot the respective shares, and with directions, in case they found partition of any tracts impracticable, to report the facts to the court, to appraise every tract with and without improvements, and to take testimony on all these matters and report their proceedings. The decree also referred the cause to a special master to report special facts as to improvements, rents, profits, taxes, and assessments, and required him to reduce the evidence to writing and report the same. The court expressly reserved all questions as to improve

ments, accounting of rents and profits, and allowances of taxes and expenses, for further order. *Held*, that this was not a final, appealable decree, and that consequently errors arising thereon could be assigned as error upon an appeal taken more than two years later from a subsequent final decree made in the cause. Green v. Fisk, 103 U. S. 518, followed.

19. SAME—APPEAL—ACTION OF COURT BELOW.

Upon an appeal from a final decree the appellate court, in determining the question whether a prior decree in the same cause, entered more than two years before the appeal was taken, was a final decree, so that no errors could be assigned thereon upon the present appeal, will give weight to the fact that the court below treated the former decree as merely interlocutory, by permitting amendments and by refusing the allowance of an appeal therefrom.

20. LIMITATION OF ACTIONS—RUNNING OF STATUTE—DOUBTFUL RIGHTS.

The fact that the right of parties claiming an interest in lands by right of heirship and as remainder-men was considered very doubtful for several years after the falling in of the life estate, and until their rights were made clear by a decision in a suit between other parties, is no ground for holding that the statute of limitations was in the meantime suspended as against them.

21. APPEAL—WAIVER AND CORRECTION OF IRREGULARITIES.

Where, by a misprision of the clerk of the appellate court, an appeal is docketed as of a date prior to the time when the decree appealed from was in fact entered, but it appears that immediately after the filing of the transcript the appellees moved to dismiss the appeal on other grounds, which motion was overruled, *held*, that this was a waiver of the irregularity, and that the same should be corrected so as to make the record speak the truth.

Appeal from the Circuit Court of the United States for the Western Division of the Southern District of Ohio.

This is an appeal from a decree of the circuit court for the Southern district of Ohio ordering the partition and sale of a tract of 161¼ acres—a quarter section—on Price's Hill, a suburb of Cincinnati. The action was begun on the 4th day of December, 1886, in the superior court of Cincinnati, by Sarah McClaskey and 3 others, against more than 200 defendants. On the petition of two of the defendants the whole cause was removed to the court below under the second section of the removal act of 1875, on the ground that there was a separable controversy between the removing defendants and the complainants, who were citizens of different states. To conform to the chancery practice, the complainants filed an amended bill in the circuit court. It averred that the complainants were seised of an undivided one-fifth in fee in the tract in controversy, which had been subject to the life estate of one Maria Bigelow until her death, on August 3, 1860, when their right of entry accrued. It averred that the tract was divided into many pieces, and these were occupied by the several defendants in possession, respectively, each of whom was seised of an undivided $25/35$ part of the tract of which he had possession, and that certain other named defendants, not in possession, were seised of an undivided $3/35$ of the entire tract. In 1889 the defendants named in the bill as being out of possession filed a cross bill joining in the prayer for partition, but asserting a much larger interest in the property than that conceded to them in the bill. After much preliminary controversy the case was finally submitted on bill and answers and cross bill and answers and the proofs. The defendants in possession, among other defenses set up in their answers, pleaded the bar of the statute of limitations. The circuit court held that the statute was not a bar to the relief sought, that the complainants were seised of an undivided $1/6$ of the tract, that the cross complainants were seised of $1/6$ plus $1/18$, and that the other defendants were entitled to the remainder or $11/18$ of the several parts of the tracts of which they were respectively in possession, and, after fixing the amount to be allowed for im-

provements made between 1860 and the date of the commencement of the action, ordered a partition and sale. The period of limitation for the bringing of actions for the recovery of real estate in Ohio is 21 years. More than this time, by five years, had elapsed between the time when the right of entry by complainants and cross complainants had accrued, and the time when the suit was brought; but the circuit court held that the defendants in possession held under a claim of title in subserviency to that of the complainants and cross complainants, as their cotenants, and that the possession had therefore never been adverse. The court further held that, even if there had been at one time an ouster or disseisin by the defendants in possession, they had subsequently purged it by accepting deeds of undivided interests under the same title as that of complainants and cross complainants. McClaskey v. Barr, 47 Fed. 154; Id., 42 Fed. 609.

The quarter section in controversy was owned in 1815 by William Barr, Sr. He died in 1816, and by his will he devised the tract to his three sons-in-law and their heirs in trust to pay the income to his son, John M. Barr, for life, and, in case he should die leaving a child, then also in trust for his son's wife, Maria, during her life, and upon the decease of the said Maria the testator devised the remainder in fee to his son's child. In case his son died without leaving issue, he devised the remainder to his sons-in-law and their heirs forever. He also devised the residue of his estate to his sons-in-law. John M. Barr, the son, had one daughter, who survived him 18 months, and died in 1821. The widow married John Bigelow in 1824. By the decision of the supreme court of Ohio in Bigelow v. Barr, 4 Ohio, 358, under the will of William Barr, Sr., Maria Bigelow took a life estate in the land on the death of her first husband. Until the decision of the supreme court of the United States in Poor v. Considine, in 1867, reported in 6 Wall. 458, it was the subject of much discussion whether, under the will, the remainder in the tract vested in the sons-in-law of Wm. Barr, Sr., after the death of Mary Jane Barr, or vested in her heirs, and, if the latter, whether, by the then statute of descents of Ohio, the estate passed to the children and descendants of William Barr, Sr., or to his brothers and sisters and their heirs. By that decision it was settled that Mary Jane Barr, granddaughter of William Barr, Sr., on the death of her father, John M. Barr, took a vested estate in remainder in the tract, subject to the life estate of her mother, Maria Bigelow, and that by the Ohio statute of descents, on the death of Mary Jane Barr, in 1821, the fee in remainder ascended to the ancestor, William Barr, Sr., from whom it had come, and vested in his brothers and sisters and their heirs. In 1838 Maria Bigelow sold the tract to Ephraim Morgan and Lot Pugh for $2,000, by deed wherein she "granted, bargained, sold, conveyed, released, and forever quitclaimed * * * unto the said Ephraim Morgan and Lot Pugh, their heirs and assigns forever, all that certain farm or tract of land [describing it], and all the estate, right, title, and interest, claim and demand, both in law and equity, of her, the said Maria Bigelow, * * * to the only proper use and behoof" of Morgan and Pugh, "their heirs and assigns forever," and warranted, for herself and heirs, the title against all persons claiming by, through, or under her. In 1839 Pugh, for $500, conveyed the lot to Morgan by deed wherein he granted, bargained, sold, conveyed, and quitclaimed it to Morgan and his heirs. After his purchase Morgan was advised that the fee of the land was in the brothers and sisters of William Barr, Sr., and their heirs, subject to the life estate of Maria Bigelow. He thereupon sent his son-in-law, Dr. William Wood, to Westmoreland and Cumberland counties, Pa., where William Barr, Sr., had lived before coming to Cincinnati, to purchase the interests in remainder of the heirs of his brothers and sisters. Wood spent a number of days in that neighborhood and elsewhere, in his search, and brought back to Morgan 12 different deeds, from more than that number of persons, conveying to him (Wood) all their interests in the fee-simple title to the tract in question. Wood procured seven more deeds of the same character, one in each of the years 1841, 1843, 1845, 1846, 1847, 1850, and 1853. These interests were duly conveyed to Morgan in two deeds, in fee simple, one in 1839 and the other in 1857, in the first of which the recital was that the title conveyed was that of the interests of "the"

heirs of the brothers and sisters of William Barr, Sr. About the time he received the Wood deed, in 1839, Morgan began the sale of the tract, and between 1839 and August 3, 1860, when Maria Bigelow died, he had sold all but 23 acres of the quarter section. Morgan had, in that period, executed eight deeds of various pieces, with covenants of general warranty, and the grantees had taken possession under them. Some of his grantees had in turn made like sales, with like deeds. Prior to the death of the life tenant, Morgan had given seven different mortgages, covering collectively the whole tract retained by him, in which he granted the fee simple of the same, with covenants of general warranty. The deeds and mortgages were all duly recorded in the recorder's office of Hamilton county. All but two of the nine different tracts into which the quarter section was thus divided were occupied as suburban homes by their owners, who erected substantial country residences thereon, and inclosed and beautified their land with shade trees and otherwise. One tract of five acres was conveyed by Considine, a grantee and purchaser of Morgan, in 1847, to the Catholic archbishop of Cincinnati, John B. Purcell, and his heirs, to build thereon a college for the education of young men for the Catholic priesthood. At a cost of $20,000 or more, a college building was erected on this tract in 1847, and has ever since been continuously used for this purpose. The residences built on the different tracts were all in good condition and repair, when Maria Bigelow died, on the 3d of August, 1860. Her death made no difference in the character of the occupancy of Morgan and his grantees. On August 3, 1860, the persons in possession, and their respective tracts, were as follows:

| | | |
|---|---|---|
| Patrick Considine | 66 | acres |
| Archbishop Purcell | 14.738 | acres |
| Caroline Young | 25.29 | acres |
| S. S. Boyle | 20 | acres |
| E. Henry Carter | 4 | acres |
| J. B. Hubbard | 10 | acres |
| Ephraim Morgan | 23 | acres |

Considine, from 1860, continued to occupy his residence and to farm his land, until 1868, when he sold two tracts of 10 acres each for $10,000 apiece, with deeds of general warranty. He died in 1873, and by his will devised the remainder of the tract to Archbishop Purcell, subject to a life estate in his brother and sisters. The sisters being dead, the brother conveyed his life estate to the archbishop in 1874. The archbishop leased the tract in 1874 at a yearly rental of 6 per cent. on $2,000 an acre, with a privilege of purchase, and a covenant to convey the fee, by deed of general warranty, in blocks of four acres or more. The other land of Purcell continued to be used for seminary purposes. In 1863 a fire consumed the south wing of the building, and it was rebuilt at a heavy outlay. In 1867 or 1868 a north wing was built at a cost of $50,000. The grounds were improved, graded, and planted with shade trees. The Young tract continued to be used as a country residence until subdivided into town lots in 1881. Upon the Boyle tract of 20 acres was built a mansion house, which was begun in 1859, and only completed in 1867, at a cost of $200,000. E. Henry Carter occupied his tract as a residence until April, 1869, when he sold, with deed of general warranty, to W. A. Blanchard, for $8,000. J. B. Hubbard conveyed his 10 acres to his wife in 1861 by deed of general warranty. In 1866 they united to convey the same by like deed to Henry Closterman, to secure $10,000. The house and place were continuously occupied as a suburban residence. Ephraim Morgan, in September, 1860, after the death of Maria Bigelow, gave a mortgage on his homestead to John H. Groesbeck, with covenants of general warranty, for $5,500, and in the next two years gave three others of the same kind to secure upwards of $25,000. In January, 1867, he deeded 6¼ acres to W. H. Taylor, with covenants of general warranty, for $5,250. The next year Taylor sold 1¼ acres of this tract to the board of education, and a schoolhouse was erected thereon. In 1867 Morgan sold 3 acres to E. W. Boyle by general warranty deed, and in 1869 he sold 6 acres to T. D. Lincoln for $6,000, by like deed. He continued to occupy his residence on the remaining 8 acres until

his death, in 1873. After his death his homestead lot was sold to pay his debts at judicial sale. From 1873 until 1886, the time of bringing this suit, there was much increase in the value of the property. The Considine, Boyle, Morgan, Lincoln, and Young tracts were subdivided into city lots and sold. The number of transfers in that period was over 500. The aggregate of the considerations recited in the deeds was more than $1,200,000. The number of new houses erected was 115, and their cost $400,000. The public improvement assessments paid by the defendants in possession aggregated $100,000. The defendants in possession paid all the taxes due on the tract during all the time from 1860 to the beginning of the suit. All the deeds heretofore referred to were duly recorded.

It remains to state the legal proceedings and other acts of the defendants in possession, upon which the court below found that in spite of the circumstances showing exclusive ownership, just reviewed, the defendants in possession must be regarded as holding in privity with the complainants and cross complainants.

In 1847 Morgan filed a bill in chancery in the common pleas court of Hamilton county against the direct descendants and devisees of William Barr, Sr., to remove the cloud on his title to this quarter section, which he averred was created by the defendants' claim that under William Barr, Sr.'s, will, and the statute, the remainder in the land had passed to the son-in-law or direct descendants of the testator. He stated in his bill that he was in the possession of the land, and held the legal title to it, as he believed, and was entitled to the full and perfect enjoyment of it. He further showed that he had at various times purchased the interests and claims of the brothers and sisters of William Barr, Sr., and their heirs, in and to the said quarter section, by deeds recorded. He recited also his various conveyances of parts of the land by deeds of general warranty. The bill was dismissed without prejudice on the ground that it was prematurely filed before the death of the life tenant, the possession and title of whose grantee during her life was not disputed. In June, 1858, Morgan and his grantees filed in the same court a petition under the Ohio statutes against the same defendants and some others to perpetuate the testimony of Maria Bigelow, to be used in a suit which, as they averred, they feared would be brought against them on her death. In the petition Morgan alleged that, after acquiring the life estate of Maria Bigelow, he had purchased the interests of "nearly all" the brothers and sisters of William Barr, Sr., and their heirs; that, for the purpose of sustaining the title under which petitioners claimed, it was necessary to perpetuate the evidence of Mrs. Bigelow as to the relative dates of the death of Mary Jane Barr and her father, and the relationship of the various persons from whom Morgan had secured deeds to the brothers and sisters of William Barr, Sr. The answer to the bill in the present suit of the defendants in possession, which was required to be under oath, and is therefore evidence in the cause against complainants, avers that the small outstanding interests not purchased by Morgan, and referred to by implication in the phrase "nearly all," in the foregoing petition, were only those of the children of William Barr, Jr., and Mary Barr, his wife, who were cousins. The cross bill of the defendants not in possession charges that these words were intended to have the same meaning. Mary Barr was the daughter of William Barr, Sr., and as such entitled to one-third of the land, if it went to his direct descendants. William Barr was the son-in-law and a devisee of William Barr, Sr., and as such entitled to one-third of the land, if it vested by the will in the three sons-in-law. But this William Barr was a son and heir of Samuel Barr, a brother of William Barr, Sr., and as such entitled to a comparatively small share in the land, if it vested in the brothers and sisters of William Barr, Sr. Morgan could not buy this interest, because it was disavowed by those entitled, who claimed to take, not through Samuel Barr, but as the direct devisees of the testator. Maria Bigelow's deposition was taken. After testifying to the fact that her daughter Mary Jane Barr had survived John M. Barr, which it was the chief purpose of the petitioners to prove, she testified to what she knew of the brothers and sisters of William Barr, Sr., and their descendants. She said that William Barr, Sr., had three or four brothers, she thought; that she knew he had three, Robert, Samuel, and John,

and she thought there was a brother Andrew, who went to Kentucky, but of this she was not certain; that he had two sisters, one named Jane, who married a Mewhirter, and the other she thought was named Sarah, married a Grafton, and went to Natchez, Miss.; she knew they were all dead but Mrs. Mewhirter, and she thought she was dead; that Robert, the eldest brother, left no children; that John Barr left seven children; that Samuel Barr left five children; that Mrs. Grafton left three sons and a daughter, but whether they left any heirs she could not state; that the boys, she was sure, died young; that, as to the daughter, she was not sure. She was able to identify but seven or eight of the grantors in the deeds which Morgan, through Wood, had procured from persons whom he supposed to be heirs of the brothers and sisters of William Barr, Sr.

In December, 1863, more than 23 years before the bill in this cause was filed, Margaret Poor, who was one of the six children of William Barr and Mary Barr, the daughter of William Barr, Sr., and who had acquired the interests of two of her sisters and one brother, brought suit in ejectment against Considine, Morgan, and the others in possession of the quarter section. The defendants pleaded not guilty. On an agreed statement of facts, a verdict by direction of court was rendered for the plaintiff for $1/30$. The court held that the plaintiff took nothing by descent from the testator, William Barr, Sr., but only by descent from Samuel Barr, the testator's brother. The agreed statement set forth the names of the brothers and sisters of William Barr, Sr., six in number, as Mrs. Bigelow had given them. It recited that two of them had died without issue; that Morgan had acquired $29/30$ of the interests of the four who left heirs, and that Margaret Poor had the remaining $1/30$. Mrs. Poor's share was determined in this wise. She had $4/6$ of her father's (William, Jr.'s) share, which was $1/5$ of his father's (Samuel's) share, which was $\frac{1}{4}$ of the entire tract, i. e. $4/6$ of $1/5$ of $\frac{1}{4}$, or $1/30$. The case of Poor v. Considine was decided by the supreme court of the United States in April, 1868. In December following the tenants in possession authorized Lincoln & Smith, as trustees, to purchase the outstanding interests in said real estate claimed by the several heirs of William Barr, John T. Barr, and Margaret Keys, formerly Barr, "to sustain the present title of the tenants in possession." These three persons were the children of Samuel Barr, whose interests Morgan had not been able to purchase because the children of William Barr and some of the children of Margaret Keys were interested in maintaining that the estate vested in the descendants of William Barr, Sr., instead of in those of his brothers and sisters. These were the outstanding interests to which Morgan referred in the expression, in his petition to perpetuate testimony in 1859, "nearly all." These outstanding interests were purchased, and the deed recited that the grantees claimed adversarily to the grantors. In 1871 T. D. Lincoln purchased the outstanding interests of certain of the children and heirs of Andrew Barr. This deed of 1871 recited the claims of heirship and the share conveyed, and contained covenants of general warranty. In 1873, 1874, and 1877, the tenants in possession purchased the outstanding interests of three of the eleven children of Jane Mewhirter. The deeds of 1873 and following were quitclaim deeds, though the exact shares conveyed were set out. The deeds from 1868 to 1877 stated the shares conveyed as if there were five of the brothers and sisters of William Barr, Sr., who had left heirs or devisees to take, instead of four, as recited in the agreed statement in Poor v. Considine. There was much evidence in the record to show that the deeds from 1871 to 1877 were of interests bought to buy peace and to avoid litigation, and that on each purchase strong assurances were given to the defendants in possession that these were the last claims which could be presented. The considerations paid were from one-third to one-half of the real value of the interests conveyed. On July 28, 1881, Robert Barr, Samuel Barr, Jane Chapman, and Martha Reed, descendants of John Barr, a brother of William Barr, Sr., each brought a partition suit in the common pleas court of Hamilton county, Ohio, in which he or she claimed one-fortieth interest in this tract, and named many of the defendants in possession as defendants thereto. Some of the defendants settled by paying small sums, but others, and those a majority, fought the case. In 1885 all the suits but that of Robert Barr were dismissed.

by the plaintiffs therein, a cross petition having been previously filed August 14, 1884, by the same plaintiffs, in Robert Barr's suit, in which Samuel Barr and certain others claimed to be devisees of one-sixth of the entire tract under the will of Robert Barr,—that brother of William Barr, Sr., who had died without issue. The same claim was set up by the same parties in the present suit by the cross bill. In the Hamilton common pleas court, the suit resulted in a defeat of every claim except that of Robert Barr and others to interests aggregating 13/525 of the whole. The case was carried to the state circuit court, where it is now pending.

By the finding of the decree of the court below, it appears that Morgan, in August, 1860, when Maria Bigelow, the life tenant, died, had in fact acquired two-thirds of the interest descending to the heirs of John Barr, brother of William Barr, Sr., one-half the interest descending to the heirs of Andrew Barr, two-fifths the interest descending to the heirs of Samuel Barr, and eight-elevenths of the interest descending to the heirs of Jane Barr Mewhirter. He seems never to have acquired any of the interest descending to Robert Barr, the brother of William Barr, Sr., or of that descending to his sister Sarah or Mary Grafton, if, as found by the court below, such interests vested. The court below found that at the time this suit was brought the defendants in possession had acquired, in addition to the interests received from Morgan, the other half of the interests of Andrew Barr, three-elevenths of the Mewhirter interest and three-fifths of the Samuel Barr interest, so that they had all the interests of Samuel, Andrew, and Jane, and two-thirds of John's. The court below held that Robert Barr, Sr., survived Mary Jane Barr about a year, and that, though he left no issue, the interest which vested in him upon her death passed by his will to the cross complainants, or some of them. The court also found that the name of William Barr's sister, who married a Grafton, was Mary, and not Sarah, as Mrs. Bigelow had called her, and that the complainants were her sole heirs. There were 2, and probably 3, of the 19 deeds to Wood and Morgan, the grantors·in which the court below was unable to identify as heirs or descendants of William Barr, Sr.

R. A. Harrison, J. C. Harper, and Ledyard Lincoln, for appellants.
Henry T. Fay, for appellees Sarah E. McClaskey et al.
Samuel Crawford, for appellees Samuel Barr et al.

Before TAFT and LURTON, Circuit Judges, and SEVERENS, District Judge.

TAFT, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The defendants in possession, or the persons under whom they claim, have been in possession of the quarter section here in controversy from 1839 until the present day. The right of entry to this land under the title which the complainants and cross complainants assert accrued to them on the 3d of August, 1860, when Maria Bigelow died. This action was not begun until the 4th day of December, 1886, or 26 years and 4 months after the immediate right of possession vested in the complainants and cross complainants. The present statute of limitations of Ohio, which is substantially the same as that in force in 1860 (section 4977, Smith & B. Ed. Rev. St.), provides that "an action for the recovery of the title or possession of real property can only be brought within twenty-one years after the cause of action accrues." Under the construction put upon this statute by the supreme court of Ohio, an open, notorious, exclusive, and adverse possession of land for 21 years, with or without color

of title, whether continuous in the first possessor, or tolled in persons claiming under him, and whether with or without knowledge of the existence of a better title, confers upon the original possessor, or those claiming under him, an indefeasible title in fee. Paine v. Skinner, 8 Ohio, 159, 165, 167; Yetzer v. Thoman, 17 Ohio St. 130; McNeely v. Langan, 22 Ohio St. 32, 37. This is a rule of property binding on federal courts of law and equity in adjudicating upon titles to real estate in Ohio. Miles v. Caldwell, 2 Wall. 36; Blanchard v. Brown, 3 Wall. 245, 249; Britton v. Thornton, 112 U. S. 526, 5 Sup. Ct. 291; Smelting Co. v. Hall, 106 U. S. 86, 1 Sup. Ct. 128; Orvis v. Powell, 98 U. S. 176. In view of the lapse of time between the accruing of the right of possession and the bringing of the action, the only question for our consideration on this branch of the case is whether the possession of the defendants in possession was adverse to the title and claim of the complainants and cross complainants. For brevity, we shall hereafter refer to the defendants in possession as "defendants," and to the complainants and cross complainants as "claimants."

The conclusion of the circuit court that the statute of limitations created no bar to claimants' action was based on these three propositions: First. That the defendants had entered the land in subserviency to the title of the heirs of the brothers and sisters of William Barr, Sr., and therefore as tenants in common of the fee with the claimants, who were some of such heirs. Second. That a possession begun by defendants as tenants in common with claimants could not become adverse, so as to set the statute running, until actual notice of the intent to disseise them was brought home to the claimants, and no such notice was shown in this case. Third. That even if the original entry by defendants had been adverse, or it had become so by actual disseisin, yet the disseisin was purged by acts of the defendants which were in law and in fact an acknowledgment of the validity of the title of claimants, and conclusively showed an intention thereafter to hold under it. We propose to examine these propositions in their order, and to consider their application to the case at bar. When a tenant in common, claiming as such, enters upon the common land, he is exercising the right which his title gives him, and his resulting possession is presumed to be consistent with his avowed title, and therefore to be the possession of his cotenants and himself. His cotenants have the right to rely on this presumption until his acts or declarations are palpably inconsistent with it. The law fully recognizes that he may oust them, but he cannot do so except by acts so distinctly hostile to the rights of his cotenants that his intention to disseise them is unmistakable. Notice of this intention must be brought home to his cotenants, but whether this must be actual, or may be constructive, it is not necessary at this point to discuss. It suffices for our present purpose to say that the rule thus stated has no application to any case except where the possession of the person in question was avowedly begun as a tenant in common, or under a deed which defined his title as such.

1. We come, therefore, to the question whether the defendants began their possession in August, 1860, as tenants in common with the claimants. The circumstances under which Morgan and his grantees began this possession are somewhat different, and we shall consider their cases separately. When the life tenant died, in August, 1860, all but 23 acres of the quarter section was held by persons who claimed exclusive ownership in fee to the pieces they respectively occupied, under deeds from Morgan in fee simple, with covenants of general warranty. They or their predecessors in title had entered under these deeds, and were maintaining possession thereunder when the rights of the claimants accrued. Such an entry and possession is an ouster of all other persons claiming an interest in the land, at and from the time they have a right of entry. It is immaterial that the fee-simple deeds under which the entries were made actually vested only the title to a life estate or an undivided interest. The extent of the estate purporting to be conveyed characterizes the entry and subsequent possession, and shows beyond doubt that they were made under a claim to the whole, and were with intent to oust all others asserting an interest. This is well settled by federal and state authorities. Prescott v. Nevers, 4 Mason, 326, Fed. Cas. No. 11,390; Bradstreet v. Huntington, 5 Pet. 402; Clymer's Lessee v. Dawkins, 3 How. 674; Hall v. Law, 102 U. S. 461, 466; Christie v. Gage, 71 N. Y. 189; Jackson v. Smith, 13 Johns. 406; Clapp v. Bromagham, 9 Cow. 530, 551, 557; Kittredge v. Proprietors, 17 Pick. 246; Foulke v. Bond, 41 N. J. Law, 527, 539, 541; Sands v. Davis, 40 Mich. 14, 18; Greenhill v. Biggs, 85 Ky. 155, 2 S. W. 774; Freem. Coten. § 224, and cases cited. The principle is recognized in Ohio, although there is no authority directly illustrating it. Youngs v. Heffner, 36 Ohio St. 232; Hogg v. Beerman, 41 Ohio St. 81.

It is suggested that the fact that these deeds from Morgan were made, and possession begun under them, before the claimants' right of entry accrued, should prevent their having any effect to oust the latter. The contention is without merit. The question is whether the possession of the defendants was adverse after the life tenant died. There was no change in the claim or character of the possession after the life estate determined. It continued as before, and we can only know its nature by reference to the circumstances under which it began and was continued. Thus, the warranty deeds from Morgan prior to the falling in of the life estate are of first importance in showing whether the possession taken by virtue of them was intended to be, and was in fact, adverse, when continued after the time at which claimants' right of entry accrued. There can be no doubt of the correctness of this view, on principle, and the authorities fully support it. In Constantine v. Van Winkle, 6 Hill, 177, 195, the question was whether the possession of a grantee in a deed of husband and wife purporting to pass the fee of the wife, but in fact, because of a defective acknowledgment of the wife, passing only the life estate of the husband, was adverse, after the husband's death, to the claims of the heirs of the wife; and it was

held that it was so, and must be referred to the deed under which it began during the pendency of the husband's life estate. In Miller v. Railway Co., 132 U. S. 662, 692, 10 Sup. Ct. 206, the supreme court determined the adverse character of the possession of a defendant under a statute of limitations by reference to a deed under which it had begun at a time before the statute could begin to run, because the title was then in the government. In Kinsell v. Daggett, 11 Me. 309, 314, the defendant took exclusive possession of a dam while the fee was in the state. Subsequently the state conveyed the fee to the plaintiff, who sought to avoid the effect of the statute of limitations by denying that defendant's possession was adverse, urging that the acts of disseisin before title passed from the state, when the statute did not run, could not characterize the possession thereafter. The argument was not sustained. The court said:

"Holding exclusively and adversely and openly are the highest acts in the power of the disseisor to indicate his intentions; and, if he thus hold prior to the conveyance from the state, what more could he do subsequently to constitute a disseisin?"

Nor is there any substantial ground for maintaining that the possession of the 23 acres held by Morgan in 1860 was begun or continued as that of a tenant in common with claimants.

He began his possession under a deed from Maria Bigelow, which conveyed to him and Pugh, whose interest he soon acquired, the entire tract, with words of inheritance. The deed actually conveyed but a life estate, but it purported to convey a fee. Within a year after, and before he had actually obtained any other legal title, he executed a deed in fee of nearly one-half the tract to Considine, with covenants of general warranty. In the interval between the Bigelow and the Considine deed, being advised that the Bigelow deed only passed a life's estate, and that the remainder in fee was outstanding in the brothers and sisters of William Barr, Sr., and their heirs, he procured Wood to buy in their interests; and upon December 16, 1839, four days after the Considine deed, Wood executed a deed to him in fee simple of the entire tract, reciting that he thereby conveyed to Morgan the title conveyed to him by the heirs at law of William Barr, Sr. It is immaterial for our present purpose whether thereafter Morgan's possession is to be referred to the Bigelow or the Wood deed, for in either case his claim of title thereunder was wholly inconsistent with, and necessarily excluded, any implied admission or avowal that he was holding in common with, or for the benefit of, any one else, whether heirs of William Barr, Sr., or otherwise. The language of Wood's deed conveying a fee-simple title derived from the heirs of William Barr, Sr., necessarily implied that there were no other heirs entitled than those persons whose interests were thus being conveyed. In Jackson v. Smith, 13 Johns. 406, the conveyance by one, as the heir of another, of an entire tract in fee simple, was held to imply the conveyance of the ancestor's entire estate in the land, and possession thereunder was held to be adverse to eight other heirs of the same ancestor equally entitled with the grantor. As already shown by

the authorities above cited, it is wholly immaterial in this discussion that Maria Bigelow had only a life estate, and that Wood did not have in him the title of all the heirs of the brothers and sisters of William Barr, Sr. It suffices that the Bigelow deed purported to convey the fee, and that the Wood deed purported to convey the entire remainder in fee then outstanding in the heirs of William Barr, Sr.

Allusion has been made to the fact that Morgan's general warranty deed to Considine was executed before Wood's deed to Morgan. While this is true, the deeds were but four days apart, and they should perhaps be treated as contemporaneous. Read in the light of the covenants assuring Considine a title in fee, clear, free, and unincumbered, Morgan's claim of title under both the Bigelow and the Wood deeds cannot be mistaken. It was to a fee in severalty. Morgan's subsequent dealing with his title was a continued assertion of its complete and exclusive character, down to the falling in of the life estate. He asserted it in his bill to quiet title in 1847, and he reiterated the assertion in eight different deeds of general warranty executed between 1839 and 1860, by which, at Mrs. Bigelow's death, he had parted with all but 23 acres of the quarter section. His petition to perpetuate testimony filed in 1858 was a claim of exclusive title under the Wood deeds, with the admission and exception of a small outstanding interest in the descendants of Samuel Barr, which he first contested in the Poor-Considine suit, and then bought. That he did not intend to hold as a cotenant even with these heirs was shown by deeds and mortgages of the entire fee executed about the time of filing the petition, and in the interval between that time and the falling in of the life estate. The same objection is made to a consideration of Morgan's acts prior to 1860 to determine the character of his possession thereafter, that we have discussed above in fixing the adverse character of the possession of the other defendants, and for the reasons and precedents there given it is equally untenable here. It is also objected that the possession of the 23 acres held by Morgan in 1860 cannot be affected or rendered adverse by his dealings with the remainder of the quarter section. Generally it may be admitted that where the bar of the statute is pleaded as to two separate pieces of land, against the same claimant, adverse possession of each must be made out by circumstances relating to the possession of each piece respectively. But it would seem that where, by plaintiff's admission, the plaintiff and defendant are tenants in common in one continuous tract of land, and the defendant, under color of title to exclusive possession, had entered thereon, the defendant might show conveyances by him in fee to others of a much larger part of the tract than his share as admitted by plaintiff, to show that his possession of what he retained was inconsistent with and adverse to plaintiff's claim. However this may be, it is not necessary to refer to Morgan's warranty deeds of the remainder of the tract to show his assertion of exclusive ownership of the 23 acres which he retained. His mortgages, the bill to quiet title, the petition to perpetuate testimony, and the character of the occupancy, sufficiently show it.

He gave a mortgage on his homestead a month after Mrs. Bigelow's death, and three more, covering parts of the tract, in the following two years, covenanting that his title was clear, free, and unincumbered. He was made defendant in an ejectment suit brought by an heir of the brothers and sisters of William Barr, Sr., in 1863, more than 21 years before the bringing of this suit to recover the entire tract, and pleaded not guilty. He bought the title of this heir and others of the same branch after it was settled by litigation, reciting that he was holding adversarily. He sold five acres in 1867, and three more in the same year, with deeds of general warranty. He sold six acres with a like deed in 1869, and in 1873 he died in the house he had built upon the tract and occupied for 44 years. His house and the remaining eight acres were sold under judicial proceedings, and a deed in fee executed to the purchaser, who holds it to this day. Entering as he did under a claim to the fee of the tract in severalty, under deeds which purported to give such a title, we are of opinion that his possession was never in privity with claimants, as their tenant in common, or in subordination to them.

2. But, even if we were to concede that the tenancy of defendants and those under whom they claim was begun as tenants in common with claimants, we cannot agree with the court below in the view that the facts shown in this record were not sufficiently brought home to the claimants to constitute a disseisin, and to set the statute running. Where one enters avowedly as tenant in common with others, his possession is the possession of those others, so long as the tenancy in common is not openly disavowed. Before adverse possession by one tenant in common against another can begin, the one in possession must, by acts of the most open and notorious character, clearly show to the world, and to all having occasion to observe the condition and occupancy of the property, that his possession is intended to exclude, and does exclude, the rights of his cotenant. It is not necessary for him to give actual notice of this ouster or disseising of his cotenant, to him. He must, in the language of the authorities, "bring it home" to his cotenant. But he may do this by conduct, the implication of which cannot escape the notice of the world about him, or of any one, though not a resident in the neighborhood, who has an interest in the property, and exercises that degree of attention in respect to what is his that the law presumes in every owner. Said Mr. Justice Bradley in Re Broderick's Will, 21 Wall. 503, 519:

"Parties cannot, by their seclusion from the means of information, claim exemption from the laws that control human affairs, and set up a right to open up all transactions of the past. The world must move on, and those who claim an interest in persons and things must be charged with the knowledge of their status and condition, and of the vicissitudes to which they are subject."

See, also, Townsend v. Eichelberger (Ohio Sup.) 38 N. E. 207; Webster v. Society, 50 Ohio St. 1, 13, 33 N. E. 297; State v. Standard Oil Co., 49 Ohio St. 137, 188, 30 N. E. 279; Williams v. Coal Co., 37 Ohio St. 583; Howk v. Minnick, 19 Ohio St. 462. There are some authorities in which language is used indicating that, before a tenant in com-

mon can hold adversely to his cotenants, he must prove that his cotenants had actual knowledge of his intention to assume exclusive possession, but it will be found that the language was not necessary to the decision of the cases under consideration. Such a case is Chandler v. Ricker, 49 Vt. 128. By the overwhelming weight of authority, however, actual notice is not necessary, and acts public and notorious, and of such a character as to leave no doubt to any one observing that exclusive right of enjoyment against every one is asserted by the holder, are quite sufficient to bring home notice of ouster to the tenants in common. Such is the law of Ohio. In Hogg v. Beerman, 41 Ohio St. 81, 99, the court states the rule as to the adverse possession of one who entered under a deed conferring title as a tenant in common as follows:

"He had full right to so enter. Having so entered, his possession continued referable to that deed continued to be that of one tenant in common—until by unmistakable acts, of which his cotenants had notice, or of which it was their duty to take notice, he disclaimed to hold as a tenant in common, and asserted ownership of the entire estate."

In the case of Youngs v. Heffner, 36 Ohio St. 232, two brothers owned a tract in common. One left and went to Texas, leaving the farm to the other, with the agreement that he cultivate the farm for the benefit of both. Trace of the absent brother was lost for more than seven years, and steps were taken to settle his estate as of one dead. Partition proceedings were brought by his representatives, and the tract sold in fee. Twelve years after, the brother returned. The supreme court held that previous to the partition proceedings the tenancy had been avowedly in common, but that thereafter the possession was adverse, although the absent brother had not actual notice of them. The question has been decided in the same way in many well-considered cases in other states. Warfield v. Lindell, 38 Mo. 561; Rich v. Bray, 37 Fed. 277, 278; Lodge v. Patterson, 3 Watts, 74–77; Dikeman v. Parrish, 6 Pa. St. 210, 227; Weisinger v. Murphy, 2 Head, 674; Greenhill v. Biggs, 85 Ky. 155, 2 S. W. 774; Winterburn v. Chambers, 91 Cal. 182, 27 Pac. 658; Bath v. Valdez, 70 Cal. 350, 11 Pac. 724; Forest v. Jackson, 56 N. H. 357; Roberts v. Moore, 3 Wall. Jr. 292, 294, 297, Fed. Cas. No. 11,905; Foulke v. Bond, 41 N. J. Law, 527, 540; Rutter v. Small, 68 Md. 133, 11 Atl. 698; Freem. Coten. § 230. There is nothing in the cases of Graydon v. Hurd, 6 U. S. App. 610, 5 C. C. A. 258, and 55 Fed. 724, and Root v. Woolworth, 150 U. S. 415, 14 Sup. Ct. 136, which should vary our conclusion. In those cases it was attempted to show that a possession begun in avowed subordination to another's title had been rendered adverse by mere acts in pais upon the land, like the building of fences, the clearing of timber, and the cultivation of the soil,—acts that were in their nature quite consistent with a superior title in another. There were in those cases no open, notorious, and publicly recorded declarations of exclusive ownership on the part of the defendant, in judicial or other public proceedings, of which it would be the duty of an owner to take notice. The court below rested its ruling, that nothing short of actual notice of disseisin to the cotenants out of possession would render adverse possession

begun in privity with them, upon the language of the supreme court of the United States in Zeller's Lessee v. Eckert, 4 How. 289. In that case a testator devised land to his son, but permitted his wife to occupy it until the time when the son should be 15 years old. The son died. The wife married again, and had a second son, and the second husband and second son remained on the land for many years after the first son would have been 15 years old. The question was whether the possession of the second son and second husband was adverse to the heirs of the first son, and when it became so. It appeared that, even before the expiration of the time within which the wife was permitted under the will to occupy the land, suit had been begun by the heirs of the first son to recover the land, which was resisted by the second son and his father, and ended in an arbitration and award against the plaintiffs, and that a second suit ended in a compromise, which was not carried out. It was held that the possession of the second son and his father was adverse from the time the plaintiffs had a right of entry, i. e. upon the day the first son would have been 15 years of age. No question arose in this case whether constructive notice of a disseisin was sufficient, because actual notice was undisputed. The words of the court so much relied on were not used, therefore, with reference to such a distinction. They were as follows:

"The original possession of Eckert, the husband of the widow, being confessedly in subordination to the title of the younger White during his lifetime, and after his decease to the title of the heirs at law, down to 1809, when the right to occupy under the will ceased, the burden was upon him to establish a change in the character of the possession after this period; and, being thus in privity with the title of the rightful owner, nothing short of an open and explicit disavowal and disclaimer of a holding under that title, and assertion of title in himself or in his son, the half-brother, brought home to the lessors of the plaintiff, will satisfy the law. Short of this, he will still be regarded as holding in subserviency to the rightful title. * * * The only distinction between this class of cases and those in which no privity between the parties existed when the possession commenced is in the degree of proof required to establish the adverse character of the possession. As that was originally taken and held in subserviency to the title of the real owner, a clear, positive, and continued disclaimer and disavowal of the title, and assertion of an adverse right, and to be brought home to the party, are indispensable before any foundation can be laid for the operation of the statute. Otherwise the grossest injustice might be practiced; for, without such notice, he might well rely upon the fiduciary relations under which the possession was originally taken and held, and upon the subordinate character of the possession, as the legal result of those relations. The statute, therefore, does not begin to operate until the possession, before consistent with the title of the real owner, becomes tortious and wrongful by the disloyal acts of the tenant, which must be open, continued, and notorious, so as to preclude all doubt as to the character of the holding, or the want of knowledge on the part of the owner."

All that the court meant here to say was that the evidence of the intention on the part of the tenant in possession to disseise the owner must be of such an open, notorious, distinct, and unmistakable character that the owner must have known of the disseisin if he exercised the slightest care with respect to his property. This is clearly shown by the decision of the same court in the term previous, in

Clymer's Lessee v. Dawkins, 3 How. 674, in which, unlike Zeller's Lessee v. Eckert, the question whether constructive notice of disseisin was sufficient, as between tenants in common, did arise, and had to be decided. In that case three tenants in common held 7,000 acres in Kentucky. Two of them, without the knowledge of the third, who lived in another state, instituted partition proceedings in a court of Kentucky, and the tract was divided, and the two complainants entered in possession in severalty of the parts allotted to them respectively. The partition proceedings were defective because not in compliance with the statute, and were claimed to be void. The period of limitation after the partition proceedings expired before the third owner brought suit in ejectment against his cotenants. He was held to be barred on the ground that possession of his cotenants became adverse from and after the defective partition proceedings. Mr. Justice Story delivered the opinion of the court, and said:

"In our judgment, it is wholly unnecessary to decide whether those proceedings [i. e. the partition] were absolutely void or not; for, assuming them to have been defective or invalid, still, as they were matter of public notoriety, of which Clymer was bound, at his peril, to take notice, and as Lynch and Blanton, under those proceedings, claimed an exclusive title to the land assigned to them, adversely to Clymer, if the defendants entered under that exclusive title the possession must be deemed adverse, in point of law, to that of Clymer. * * * It is true that the entry and possession of one tenant in common of and into the land held in common is ordinarily deemed the entry and possession of all the tenants, and this presumption will prevail in favor of all until some notorious act of ouster or adverse possession by the party so entering into possession is brought home to the knowledge or notice of the others. When this occurs the possession is from that period treated as adverse to the other tenants, and it will afterwards be as operative against them as if the party had entered under an adverse title. Now, such a notorious ouster or adverse possession may be by overt act in pais, of which other tenants have due notice, or by the assertion in any proceeding at law of a several and distinct claim or title to an entirety of the whole land, or, as in the present case, of a several and distinct title to the entirety of the whole of the tenant's purparty under a partition which, in contemplation of law, is known to the other tenants."

The case of Clymer's Lessee v. Dawkins is not mentioned in Zeller's Lessee v. Eckert. Certainly we cannot suppose that the supreme court in the latter case intended to overrule the decision in the former without referring to it, especially when such action was wholly unnecessary to the decision of the later case. If a tenant in common, in order to make his possession adverse to a cotenant, is obliged to seek the latter out and actually inform him of his intention, then it would become impossible to set the statute running against absent heirs, whose existence and whereabouts were unknown to the tenant, and whose heirship and interest in the property were unknown to themselves. It is certainly the policy of the law to require claims which have been latent for many years to slumber on. The disturbance of possessions of long standing, if thus encouraged, would be, as said by Mr. Justice Grier in Roberts v. Moore, 3 Wall. Jr. 292, 294, Fed. Cas. No. 11,905, an intolerable mischief to the community. Cases can be stated, doubtless, where the fiduciary relation between the possessor and the owner is actual, and not

created alone by the legal character of their respective titles, in which the dependence of the one upon the loyalty of the other is so complete that nothing but actual notice of the change from a subordinate to an adverse possession would suffice to set the statute running. In such cases it would seem that the relation must be of such a nature as affirmatively to discourage the owner from giving attention to conduct of the tenant. But the authorities cited show conclusively that no such rule obtains where the fiduciary relation, if such it can be properly called, is created merely by the character of the respective titles, and not by an actual personal dependence of the owner upon the possessor, and that in such cases the owner is bound at his peril to take notice of acts of the possessor of such open and notorious character, and so unmistakably indicative of an intention to exclude others from any interest in the land, that the world about, including the real owner, must be presumed to know and act upon them. Any other doctrine would make of a rule of law founded on the plainest principles of natural justice and equity an instrument of oppression, and a means of seriously impairing the peace of society. Indeed, in England so much trouble has arisen from the rule that the possession of one tenant in common is the possession of all that it is now provided by statute that the exclusive possession and enjoyment of the common property by one tenant shall be held to be adverse, and set the statute running, without other proof of ouster. See remarks of Mr. Justice Campbell in Campau v. Dubois, 39 Mich. 274.

In the light of these principles, we think that but one conclusion can be reached as to the adverse character of the possession of the defendants from August 3, 1860, until this suit was brought. The bill to quiet title filed in 1847 by Morgan, Considine, and others, was then still on record in the common pleas court of Hamilton county, in which he and they asserted ownership in fee in the lands in dispute. It is true that, by the petition to perpetuate testimony filed in 1858, Morgan and his grantees admitted a small outstanding interest in the heirs of Samuel Barr; but the same public records which showed this would also show deeds and mortgages, executed both before and after the filing of the petition, which asserted an exclusive ownership in fee by the possessors in the entire tract. Extensive improvements of recent date, in 1860, or actually in process of completion, were patent to the casual observer, and, in connection with the other circumstances, were entirely inconsistent with anything but an exclusive ownership in the improver, and referable only to the claim of title set forth in the recorded instruments already alluded to. Immediately after the life estate fell in, Morgan gave a number of mortgages on his homestead, covenanting that he owned it in fee simple, and these were duly recorded in the public records of Hamilton county. In 1863 he and his grantees, when sued by one who had, by the same title as claimants, a thirtieth interest or less in the property, pleaded not guilty, although she owned part of the small outstanding interest referred to by him in the petition to perpetuate testimony in 1858. And when, in 1868, he and his grantees took a deed for all these small interests

referred to in the petition of 1858, there was inserted a recital that they claimed the land adversarily to the grantors. The subsequent subdivisions, sales, judicial and otherwise, and the enormous improvements, need not be dwelt upon, except to say that it is difficult to imagine a case in which the legal presumption of knowledge of the adverse character of the possession could be stronger, as against the owners of outstanding interests.

3. There remains to consider the contention of claimants, sustained by the court below, that, whether the possession of defendants was at any time adverse to the claimants, the disseisin was subsequently purged by recognition and acquiescence of defendants in claimants' title, so that an avowed cotenancy ensued before the statute had run. This contention is chiefly rested on the purchase and acceptance by the defendants of deeds conveying to them outstanding interests of certain of the heirs of the brothers and sisters of William Barr, Sr., whose title was of the same character as that of claimants. It is well settled by binding authority that a vendee is not estopped to deny the title of his vendor. Robertson v. Pickrell, 109 U. S. 608, 614, 615, 3 Sup. Ct. 407; Watkins v. Holman, 16 Pet. 25, 54; Willison v. Watkins, 3 Pet. 43; Blight's Lessee v. Rochester, 7 Wheat. 535. And the necessary conclusion from this is drawn, in the last-named case, that the person in possession of property under a claim of complete ownership has the right to fortify his title by the purchase of any real or pretended titles, without thereby holding possession in subordination to them. This is further supported by the decisions of many other courts to the same effect. Warren v. Bowdran, 156 Mass. 280, 283, 31 N. E. 300; Gardner v. Greene, 5 R. I. 104; Chapin v. Hunt, 40 Mich. 595; Sands v. Davis, Id. 14, 18, 20; Campau v. Dubois, 39 Mich. 274, 279; Mather v. Walsh, 107 Mo. 121, 131, 17 S. W. 755; Giles v. Pratt, 2 Hill (S. C.) 439, 442; Osterhout v. Shoemaker, 3 Hill, 513, 518; Tobey v. Secor, 60 Wis. 310, 312, 19 N. W. 99. Mr. Freeman, in his work on Cotenancy and Partition, says (section 106):

"A person in possession of land may protect himself from litigation by purchasing any outstanding claim against his property. By so purchasing he does not necessarily admit the superiority of the title bought, nor change his possession, which was before adverse, into a possession subordinate to the newly-acquired title. Therefore one who is in possession of real estate does not become a tenant in common thereof by merely accepting a deed therefor from the owner of an undivided interest therein."

The following are cases where the possessor and defendant purchased outstanding titles of tenants in common with the plaintiffs in ejectment, and yet was held not to have thereby acknowledged the validity of plaintiff's title: Fox v. Widgery, 4 Me. 214; Jackson v. Smith, 13 Johns. 406, 413; Northrop v. Wright, 7 Hill, 477, 489, 496; Bryan v. Atwater, 5 Day, 181; Cannon v. Stockmon, 36 Cal. 539; Winterburn v. Chambers, 91 Cal. 183, 27 Pac. 658; Cook v. Clinton, 64 Mich. 309, 313, 31 N. W. 317. And the same rule prevails in Ohio.

In Coakley v. Perry, 3 Ohio St. 344, one Nathan Perry had purchased the land, received a conveyance, and was in possession.

Subsequently he took a deed, with covenant of warranty, from Job Doan, to whom a one-fourth interest in a tax title had descended from his father. The court say:

"It would be the grossest absurdity to conclude that Nathan Perry, by taking the conveyance from Job Doan, for a trifling consideration, contemplated, instead of continuing seised of the whole premises, as he claimed to have been before, that he became seised of only an undivided part in common with the other heirs of Job Doan's ancestor. It would seem to be just and reasonable that a person in the bona fide possession of land under a claim of title should be allowed to buy in any title, real or pretended, with a view to quiet the enjoyment of his possessions, and that the purchase of an adversary title, if it does not strengthen, should certainly not have the effect to impair, the title of the owner. It is not the policy of the law to deter persons from buying their peace, and compel them to submit to the expense and vexation of lawsuits, for fear of having their titles tainted by defects which they would gladly remedy by purchase, where it can be done with safety."

Whether the acceptance of a deed of an outstanding interest by one in possession shall affect his adverse possession, depends on all the circumstances surrounding it. Generally, if his possession began under a claim of title in fee, the purchase of another title is not to be regarded as a change of his attitude. His purchase may strengthen his title, but it is usually not permitted to impair it. Cases may perhaps be conceived where the acceptance of a deed of an interest in property by one in possession would be equivalent to an express avowal of subordination to the title of others in privity with the grantors, but it would be exceptional. The cases relied upon by the court below to establish a different doctrine do not seem to us to do so. They are Criswell v. Altenmus, 7 Watts, 565; Vaughan v. Bacon, 15 Me. 455; Carpenter v. Mendenhall, 28 Cal. 487; Carpenter v. Small, 35 Cal. 356; House v. Fuller, 13 Vt. 165; and Parker v. Proprietors, 3 Metc. (Mass.) 99. In the two cases first above cited the possessor and defendant had expressly relinquished his adverse possession and had agreed to hold under and for plaintiffs. If the two California cases contain a principle different from that we have above stated (which may be seriously questioned), they are overruled by the latter cases in the same state already cited. In House v. Fuller, 13 Vt. 165, a defendant in ejectment defended on the ground that he was a tenant in common of the plaintiff, and plaintiff had never demanded possession in common. It appeared that defendant had entered under a deed which disseised plaintiff, but that he subsequently took a deed from a tenant in common with plaintiff, and that thereafter he had never denied plaintiff's title or his right to possession. Under these circumstances it was held that defendant might claim to hold under the latter deed, but there is nothing in the case to show that, if he had chosen so to do, he might not have continued his adverse possession in spite of the second deed. In Parker's Case, in 3 Metc. (Mass.), Justice Wilde, in passing, does say that where a man without color of title disseises heirs, and subsequently buys the interest of one of them, he purges his disseisin as against all; but the remark was unnecessary to the case, and in any event would seem to have no application to a case like the present, where there is

color of title to which the disseisor's continued possession may be referred. More than this, the view we have taken is sustained by a much later decision of the same court in Warren v. Bowdran, ubi supra.

Having determined the principles applicable to this branch of the case, we come now to examine the circumstances under which these deeds of outstanding interests were taken, and the other alleged admissions of superior title in claimants were made by defendants. In his bill to quiet title, in 1847, Morgan averred that he had acquired the whole legal title, and in his petition to perpetuate testimony, in 1858, he in effect stated that he had acquired all but a small part of it. Between the filing of this petition and the death of the life tenant, Morgan had conveyed about 20 acres more of the tract by deeds of general warranty, and his grantees were selling off large tracts in fee simple, and, by most extensive improvements, were giving every possible evidence of an exclusive and adversary ownership. When one of the owners of the small interests referred to by him in his petition of 1858 sued him in ejectment in 1863, he and his grantees resisted and pleaded not guilty. How could they more clearly emphasize the fact that the purchase of outstanding interests had not been intended to put their holding in subordination to those which remained unbought? In 1869, after the Poor-Considine litigation had settled the proper descent of the title, the defendants joined in an agreement to buy up the outstanding interests of three heirs of Samuel Barr, brother of William Barr, Sr., which they had not been able to purchase, because of the litigation and the sympathy felt by that branch in the adverse claim to the entire tract made therein by the direct descendants of William Barr, Sr., with whom these heirs had intermarried. Deeds were procured, and expressly recited the adversary claim of Morgan and his grantees. In the face of this recital, how can it be said that defendants thereby changed their adverse holding into one subordinate to the title of other possible heirs? Nor can the deeds of 1871 from the heirs of Andrew Barr, or those of 1873 and 1877 from the heirs of Jane Mewhirter, be given any such effect. The proof is overwhelming, from all the attorneys now living who conducted the negotiations that led to these deeds, that they were purchased merely to avoid litigation, and with the assurance that there were no other outstanding interests. It is true that some of these deeds are drawn with covenants of general warranty, and carefully describe the interests claimed by the grantors, but deeds in this form no more estop the grantee to deny or resist grantor's title than a quitclaim. Giles v. Pratt, 2 Hill (S. C.) 439, 442.

It is suggested in the opinion of the court below that, if claimants were to be charged with constructive notice of the publicly recorded acts of defendants in regard to this property, the acceptance of these deeds would lead them to suppose that defendants' possession was not hostile to the title under which they claimed, however adverse prior acts may have rendered it. An examination of the records

from 1868 to 1881, the period covered by these deeds, would have disclosed to the claimants a dealing with all this property by its possessors utterly inconsistent with anything but their exclusive ownership. A large surburban village was constructed on the tract, with all the numerous recorded changes of ownership and permanent improvements which that implies. The claimants would hardly be justified in supposing that small householders, who had put their savings into town lots and brick houses, were doing so as tenants in common with unknown heirs, and in subserviency to their title. And this suggests another aspect of the case, which renders it still more difficult to sustain the theory that defendants purged their disseisin of claimants by accepting deeds from other heirs of the brothers and sisters of William Barr, Sr., or in any other way. A close examination of this entire record satisfies the court that when Morgan and his grantees filed their bills to quiet their title, in 1847, they supposed they had acquired all the outstanding interests of the heirs of the brothers and sisters of William Barr, Sr. Morgan so stated in his bill, and his acts and those of his grantees manifest their confidence in this belief. Indeed, when Morgan received the first Wood deed, it is probable that he then thought he had the title of all the heirs. The recital in the Wood deed, and the character of Morgan's deed to Considine, indicate as much. That Morgan should have been so much mistaken as the facts found by the court below indicate is not strange when we consider the difficulty that the parties to this record have had in tracing the true history of the various and remote branches of this numerous and widely-spread family in these days of quick communications. The egregious lapses of memory in many witnesses as to near members of the family, and the uncertainty of the claimants themselves as to their immediate relatives, show that it was entirely possible for Morgan and Wood, in 1850 and later, to have been misled as to the number and identity of the descendants of William Barr's brothers and sisters, who were far along in life when the century began. In 1858, it does appear, from his petition to perpetuate testimony, that he knew that the interests of some of the heirs of Samuel Barr were outstanding, but he and his grantees bought these as soon as the decision of the supreme court made it possible. The deposition of Maria Bigelow, taken on the petition of 1858, showed that the number of William Barr, Sr.'s, brothers and sisters was six. Her statements made it probable that the lines of two, and perhaps three, had become extinct. The finding in the Poor-Considine case was made on the basis of four inheriting lines, and in 1871 the deed of Andrew Barr's alleged heirs recited the shares on the basis of five such lines. The court below found that there were six. The sixth line was made by proof of a will by one brother who was known to have died without issue. The identity of this testator with the brother of William Barr, Sr., was fiercely contested, and the evidence presented a close question, both on its weight and competency. The evidence of the descent of those claimants who claim under Sarah or Mary Grafton, a sister of William Barr, Sr., though found

by the court below to be sufficient to sustain it, is by no means so conclusive, after years of careful preparation by acute and industrious counsel, that Morgan and his grantees, with the lights they had, might not reasonably have supposed that this line had become extinct. We quite concur with the learned judge who delivered the opinion of the court below in thinking that the deeds which Morgan and his grantees received from the Barr heirs covered those of all the heirs they could find or hear of. It was not until the decision in the case of Poor v. Considine by the supreme court of the United States had been spread abroad in the published reports of that court, and had shown the chance of an inheritance to any one bearing the name of Barr who traced his descent back to Pennsylvania, that these slumbering claimants began to appear from distant states. Till then they were as ignorant of their interests as the defendants were of their existence. Morgan and his grantees, it now appears, had actually acquired in 1860 a large part of the share descending to each of four lines; and then had deeds from other claimants, whose descent and interest Mrs. Bigelow was unable to fix in 1858, and which cannot even now be satisfactorily established. These circumstances make it entirely reasonable and probable that Morgan and his grantees in good faith believed, as they said they did, in 1847, in 1858, and in 1863, that they had acquired the interests of all the heirs of William Barr, Sr.'s, brothers and sisters, with the exception of a small interest which became theirs in 1868. From time to time, as new claimants appeared, they bought them off to round out their title, made defective by this new development, and with no intention of admitting, and not in fact believing, that there were other interests outstanding of the same kind. Each settlement after 1868 was made by the harassed possessors with the assurance that the interest purchased was the last. Indeed, it is in evidence that the counsel who had negotiated the last purchase declined employment by the present claimants, or some of them, because he had made such strong representations to the possessors that his clients were the only heirs whose shares had not been acquired. The court below expressly found that the defendants had acquired all the outstanding interests they could find or hear of. We have already pointed out why this series of purchases cannot be construed into a change in the adverse holding by Morgan and his grantees against all the world, in view of the course of their dealings with the property, which continued the same from 1860 to 1886. But what we now wish to emphasize is that even if these purchases are to be construed as admissions that the vendors had titles superior to that of the vendees, and as controlling evidence of an intention on the part of the vendees to claim under the title thus acquired, they certainly could not be held to be admissions of title in the claimants, and evidence of an intention to claim under them, whose existence and heirship they did not then suspect, and the heirship of many of whom, on the evidence adduced, they even now deny. A claim of title under an ancestor is not a claim of title under the heir, when the heirship is not known or admitted. Acquiescence in the title of one heir is entirely consistent with a possession ad-

verse to a coheir; when the fact of the relationship between the two is unsuspected or is the point in dispute. The fact of heir-ship is as material to a title by descent as the existence or valid-ity of a deed to a title by purchase, and acquiescence in the title of the ancestor and some of his heirs is no more an acknowledgment of the title of his unknown heirs than would the recognition of the title of a grantor and some of his grantees be an acknowledgment of the title of other grantees claiming under a deed, the existence, genuineness, or validity of which was not admitted. The contention of the claimants and the holding of the court below on this branch of the case, when reduced to their last logical analysis, amount to this: that when one in the exclusive possession of a tract of land, claiming it in fee under the known heirs of a former owner, is con-fronted with the claim of one asserting an interest in the property as an hitherto unknown heir of such former owner, and, through fear of its validity, buys it in the confident belief that it is the only outstanding interest, he thereby becomes the avowed cotenant of all other heirs of the same former owner, of whose existence he has no suspicion, so that his possession forever after is their possession. If this is the law, surely it is a trap for the prudent as well as the unwary. Under such circumstances, to impose on the defendants obligations to the claimants which grow out of the fiduciary rela-tion existing between avowed tenants in common, merely because defendants were trying to strengthen their title as its defects became revealed to them and to avoid the chance of litigation, seems to us to work against them great injustice.

Some argument is made to show that Morgan and his grantees ought to have known of the heirship of complainants and cross-com-plainants, if they did not, and that if they had used due diligence they might have discovered it. It would be a new doctrine, indeed, if persons in possession under a most notorious, distinct, and explicit claim of title in fee, in order to make their possession adverse to all the world, were bound to show the use on their part of due diligence in hunting up unknown heirs, and their failure to discover them. In Foulke v. Bond, 41 N. J. Law, 527, the court of errors and appeals of New Jersey, in considering a case not unlike this, on its facts, under a statute in which good faith is a necessary element of suc-cessful adverse possession, though it does not seem to be in Ohio (Yetzer v. Thoman, 17 Ohio St. 130, 132, 133), used this language:

"It is contended on the part of plaintiff that the defendant had con-structive notice of the imperfection in his title, on the principle that a party is legally chargeable with knowledge of the contents of the deeds in his claim of title, and therefore was not a purchaser bona fide. But the doctrine of constructive notice does not apply in such a case. There must be proof of actual fraud. Mere neglect to inquire into the state of the title is not suf-ficient evidence of fraud. Nor does the rule that what is sufficient to put a party on inquiry operates as notice apply in such case. There must be clear and satisfactory proof of knowledge that the title supposed to be acquired was invalid, accompanied by proof of an intent to defraud the real owner. Clapp v. Bromagham, 9 Cow. 531. If the law were otherwise under the sys-tem of recording adopted in this country, a disseisin of one tenant in common by a conveyance of the entire estate by his cotenant would be quite impossi-ble." Pages 542, 543.

The court of appeals of New York, in Sands v. Hughes, 53 N. Y. 287, said:

"The mere taking by a purchaser of a bad title is not fraud; nor is the doctrine of constructive notice of defects in the title, arising out of neglect in the purchaser to investigate, applicable on the question of adverse possession. This was decided by the court of errors in the case of Clapp v. Bromagham. 9 Cow. 558, where a deed from the committee of a lunatic and a deed from one of several tenants in common were held each to be a good basis for an adverse possession in the grantor."

But, even if due diligence were necessary, the court below, in its finding already alluded to, acquitted the defendants of failure to exercise it. The result is that the adverse possession of Morgan and his grantees against claimants began in 1860, when Maria Bigelow's life estate determined by her death, and ripened into an indefeasible title some five years before this suit was brought, and became and is a complete bar to this action.

It is claimed that the case of some of the cross complainants is taken out of the operation of the statute by the fact that suits to partition this land were brought by them in the court of common pleas of Hamilton county against the defendants in 1881, before the 21 years after the death of Maria Bigelow had expired. It does appear from the record that, six days before the statutory period had expired, four suits were brought for partition against a part of the defendants, to partition the tract in question,—one by Robert Barr, one by Samuel Barr, one by Jane Chapman, and one by Martha Reed. Each plaintiff claimed one-fortieth interest in the tract, as heir of William Barr, Sr. Three years later Samuel Barr, Jane Chapman, and Martha Reed filed cross petitions in Robert Barr's suit. Samuel Barr joined with him in this cross petition James Barr and others, and claimed one-fifth of the entire tract as devisees under the will of old Robert Barr, brother of William Barr, Sr., in addition to the one-fortieth interest set up in his suit of 1881. About a year after the filing of the cross petitions the separate suits of Samuel Barr, Jane Chapman, and Martha Reed were voluntarily dismissed. In 1889, four years later, the cross bill was filed below, in which all these interests were set forth and relied on as grounds for partition here. Meantime a decree for partition was rendered by the common pleas court for interests aggregating $^{13}/_{525}$ of the entire tract, in favor of some of the plaintiffs, and an appeal was taken to the state circuit court, where it is pending for trial de novo. It might be difficult to see how the bar of the statute could be avoided, except in the case of Robert Barr, and then only for the interest he originally claimed, to wit, one-fortieth. But we do not find it necessary to pass on this question at all, and we do not do so, because we are clearly of opinion that, however completely the claimants in the suits in the state court may have escaped the bar of the statute for the purposes of those suits, they cannot be pleaded in this action, begun several years later, to avoid the statutory bar to relief here. The bringing of one action does not stop the statute, when pleaded in a later action. Delaplaine v. Crowninshield, 3 Mason, 329, Fed. Cas. No. 3,756; Stafford v. Bryan, 1 Paige,

239; Moore v. Green, 19 How. 69, 71; Crane v. French, 38 Miss. 503, 525, 528; Callis v. Waddy, 2 Munf. 511. A judgment in ejectment in favor of the plaintiff establishes his right of entry, but does not suspend the statute of limitations. To do this there must be a change of possession. Smith v. Trabue, 1 McLean, 87, Fed. Cas. No. 13,116; Doe v. Stevens, 1 Houst. 240; Jackson v. Haviland, 13 Johns. 229, 235; Doe v. Reynolds, 27 Ala. 364, 377; Smith v. Hornback, 4 Litt. (Ky.) 232. If Robert Barr or any of his co-claimants have a good right to any interest in this land saved from the bar of the statute by the suit or suits now pending in the state courts, they must prosecute it there. Here they, equally with all their co-complainants, are barred.

One other contention of the complainants should be here noticed, although not pressed before the court in argument. In an amendment to the second amended bill, the complainants Sarah King, daughter of Augusta King, and Marcus and Luella Love, her granddaughters, sought to avoid the statute of limitations by the following averment as to their disability:

"Complainants further allege that Augusta Grafton, one of the heirs of Mary Grafton, intermarried with one James King in the month of August, 1858, prior to the determination of the life estate of Maria Bigelow; that she remained in coverture until some time in December, 1879, and that the complainants Sarah King and Marcus Love and Lauretta Love, who are the heirs of Augusta Grafton aforesaid, were therefore under disability until December, 1879, at which time said coverture was removed; and that their right of action accrued in 1879."

Augusta King was found by the court below to be an heir of Sarah or Mary Grafton, sister of William Barr, Sr. It was through her that Sarah King and the two Love children claimed. The evidence shows that her husband, James H. King, died in 1869, instead of 1879, as averred. The statute began to run against the wife at that time, and made the bar complete 21 years after the death of Maria Bigelow, in 1860. By section 4978, Rev. St. Ohio 1890, the rights of married women were saved for 10 years after the removal of the disability, if the disability continued during the 21 years; but, where the disability was removed more than 10 years before the expiration of the 21 years, the saving clause had no possible application. The bar of the statute was therefore complete against Augusta King before her death, in 1885, and she had no estate in this land which could descend to these minor complainants.

The appellants assign error to the action of the court below in taking jurisdiction of this partition in equity before the disputed questions of title had been settled by action at law. In view of our very clear conviction that on the merits the statute of limitation is a complete bar, we have deemed it best not to consider this assignment of error. The dreadful weight of this litigation should be lifted as soon as possible from this unfortunate quarter section, and, having reached the conclusion stated, we would, if we could, avoid a decision which would simply transfer this tedious and expensive controversy to another forum, there to drag its slow and exhausting length along. The objection to the equitable jurisdiction of the court below in a case

like this is one which can be waived. It is of a class of actions usually cognizable in equity, and though it be conceded that, for a special reason, it should be heard at law first, the rule is, in such a case, that the objection, if not made below, will not be considered here. Reynolds v. Watkins, 9 C. C. A. 274, 60 Fed. 824; Reynes v. Dumont, 130 U. S. 355, 9 Sup. Ct. 486; Kilbourn v. Sunderland, 130 U. S. 505, 9 Sup. Ct. 594. As the complainants and cross complainants went into equity, they cannot complain of a decree on the merits; and we may assume that the defendants, whatever may have been their previous view, are now willing to waive any objection on this ground.

Our holding as to the plea of the statute of limitations disposes of this case, and makes it unnecessary to consider any of the many interesting questions of pedigree evidence and allowances for improvements, and the much-contested validity, construction, and effect of old Robert Barr's will, which, together with the question decided, have been elaborated in the brief of counsel for appellants with an industry, ability, and copiousness of authority rarely equaled in this court. The decree of the circuit court is reversed, with instructions to dismiss the bill at the costs of the complainants and cross complainants, both in this court and the court below.

---

## On Rehearing.

### (June 14, 1895.)

Those of the appellees who were cross complainants below have filed one petition for rehearing, and those who were complainants below have filed another, based on somewhat different grounds. The petition of the cross complainants is chiefly based on the ground that the court had no jurisdiction to consider the issue upon which it decided the decrees below and directed the dismissal of the bill and cross bill. The issue decided was that the claim of title to the land in question set up in the bill and cross bill was barred by the statute of limitations. The contention of petitioners is that because the decree by which this issue was decided in the court below was entered November 17, 1891, and no appeal was allowed to that decree within six months after its rendition, its correctness cannot be examined here on the present appeal from a subsequent decree entered August 9, 1894. If the decree of 1891 is to be regarded as a final decree, the contention is sound, and the question raised therefore turns on the finality of that decree. Before examining the question on its merits, it should be said that the defendants below, out of abundant caution, lest this objection should be raised, applied to the circuit court, composed of Judges Jackson and Sage, for the allowance of an appeal from the decree of 1891 within six months after its rendition, and that those judges refused to allow the appeal on the ground that, under the decisions of the supreme court and the well-established rules of federal appellate procedure, the decree of 1891 was merely an interlocutory decree. Still further, to avoid possible prejudice to their right to appeal,

the defendants applied to me, as a member of the circuit court of appeals, for the allowance of an appeal. I wrote to Mr. Justice Brown, then assigned, as circuit justice, to this circuit, and presented the question of the finality of the decree to him. We concurred in the view taken by the judges at the circuit, refused to allow the appeal, and at the next session of the court of appeals caused an order to be entered embodying such refusal. When this cause, on the appeal subsequently taken and allowed, came on to be heard, a motion was made by counsel for appellees to dismiss or strike out certain assignments of error made by appellants, on the ground that they were based on issues disposed of in the decree of 1891, and not cognizable on this appeal. The motion was overruled on the ground that that decree was not a final decree. For the third time, on this petition, the same question is made. In view of the irremediable wrong which would be done to appellants if the refusal of both the circuit and appellate courts were erroneous, we should be very slow to change our views already expressed on this subject. A further examination completely satisfies us of the correctness of our first conclusion. The argument of counsel for petitioner persistently ignores the fact that the question of the finality of a decree, for purposes of appeal or otherwise, in the federal courts, is not affected by the procedure in the state courts, but must be governed by the statutes of the United States, and the procedure and rules of decision in those courts. Chateaugay Ore & Iron Co., Petitioner, 128 U. S. 544, 9 Sup. Ct. 150; Andes v. Slauson, 130 U. S. 435, 9 Sup. Ct. 573; Insurance Co. v. Hamilton, 11 C. C. A. 42, 63 Fed. 93; Bronson v. Schulten, 104 U. S. 410.

The bill and cross bill below were for partition of real estate. By the issues made on the pleadings, it became necessary to determine the interests and descent of the complainants and cross complainants from the ancestors in whom the original title was conceded to have been, and also the question whether the right of entry had not been barred by the statute of limitations. But these issues were but incidental to the main relief asked, which was a partition of the land, and a setting apart of their proper shares to the complainants and cross complainants. But for the fact that this was the main object of the bill, no possible ground for the jurisdiction of a court of equity existed. A mere dispute concerning title and right to possession must inevitably have been dismissed from the equity side of the court, and redocketed on the law side. In an equitable action for partition, the preliminary inquiry of the court is always as to the various undivided interests; and not until after these are fixed does the court proceed to its main judicial function in such cases,—of determining how the partition prayed for can be equitably made, and of making it. The decree of November, 1891, settled what the various undivided interests of the parties to the cause were, and found that the complainants and cross complainants were entitled to partition. It appointed three commissioners to make partition, with authority to employ a surveyor and to allot to the parties their respective shares as declared

in the decree, but, if they found it impossible to partition any tract without manifest injury, to report this fact. It further directed the commissioners to appraise every tract, with and without improvements, separately stating the value of improvements prior to the falling in of the life estate in 1860, and of those made between that date and the filing of the bill, and of those made since. They were authorized to take testimony as to all these matters, and were directed to report their proceedings to the court, and all questions as to improvements on the premises were reserved for future order of the court. The cause was further referred to a special master to report special facts as to the improvements; also to report the rents and profits received from the land through certain periods, also taxes and assessments paid, also rents and profits attributable to improvements and to land without improvements; and to reduce evidence taken to writing, and to report the same, with his conclusions, to the court. The court reserved the question of accounting of rents and profits, and of the allowances for taxes and expenses, for further order. The question of the finality of decrees is not free from difficulty, under the decisions of the supreme court, as Mr. Justice Brown points out in the case of McGourkey v. Railway Co., 146 U. S. 536, 545, 13 Sup. Ct. 170. The general rule that the learned justice lays down in this, the last expression of the supreme court on the subject, is as follows:

"It may be said in general that if the court make a decree fixing the rights and liabilities of the parties, and thereupon refer the case to a master for a ministerial purpose only, and no further proceedings in court are contemplated, the decree is final; but if it refer the case to him as a subordinate court, and for a judicial purpose, as to state an account between the parties, upon which a further decree is to be entered, the decree is not final."

Judged by this standard, the decree of 1891 was plainly not final. Neither the character of the partition nor the accounting was settled by this decree. Each was dependent on further judicial action of the court, in approving or disapproving the action of its judicial subordinates. The voluminous record of the evidence before the master and commissioners, and the strenuous controversies before the court below on the questions thus reserved, testify most emphatically to the interlocutory character of this decree. The court below treated it as merely interlocutory by subsequent amendments, and by refusing the allowance of the appeal, and this circumstance is allowed to have weight with the appellate court in determining whether the decree is final, in a doubtful case. McGourkey v. Railway Co., 146 U. S. 536, 550, 13 Sup. Ct. 170. Fortunately, however, we are not obliged in this case to refer to general rules to settle the question of the interlocutory character of this decree. In Green v. Fisk, 103 U. S. 518, the complainant filed a bill for partition of real estate not susceptible of partition (as the land in this case was also reported to be), praying a partition by sale. The court entered a decree finding the exact interest of complainant in the land, and his right to partition, and referred the case to a master "to proceed to partition according to law, under the direction of the court." It was held that it was not a final

decree. The following remarks of Chief Justice Waite, who spoke for the court in that case, are specially applicable to this.

"In partition causes, courts of equity first ascertain the rights of the several persons interested, and then make a division of the property. After the division has been made and confirmed by the court, the partition, if in kind, is completed by mutual conveyances of the allotments to the several parties. * * * A decree cannot be said to be final until the court has completed its adjudication of the cause. Here the several interests of the parties in the land have been ascertained and determined, but this is merely preparatory to the final relief which is sought; that is to say, a setting off to the complainant, in severalty, her share of the property, in money or in kind. This can only be done by a further decree of the court. Ordinarily, in chancery, commissioners are appointed to make the necessary examination and inquiries and report a partition. Upon the coming in of the report, the court acts again. If the commissioners make a division, the court must decide whether it shall be confirmed before partition, which is the primary object of the suit, is complete. If they report that a division cannot be made, and recommend a sale, the court must pass on this view of the case before the adjudication between the parties can be said to be ended."

If the decree of November, 1891, was not a final decree, as the foregoing authoritative language conclusively shows, then no final decree was entered until August, 1894; and an appeal properly taken and allowed from that decree brings up for review all the questions in the cause, both those decided by the decree of 1891 and those subsequently arising.

A second ground urged for a rehearing is that I was disqualified to sit as a member of this court, to hear this cause, because, as a circuit judge, in the circuit court, I had passed upon the question whether the decree of November, 1891, was a final appeal, and had made the order of the circuit court shown in the record of the proceedings disallowing the appeal. This ground is based on a mistake of fact. The order referred to in the record was made by Judge Sage, with Judge Jackson's concurrence. The application for the allowance of the appeal was made to me as a member of the court of appeals, and refused by me as such, with the concurrence of Mr. Justice Brown, and a record of our action spread upon the minutes of this court. That Judge Sage made the order in the circuit court is shown, not only by the affidavit of counsel and clerk, but also by the indorsement of his initials upon the original order. No evidence is adduced tending to support this ground of the motion. It does appear, by reference to the minutes of the circuit court, which this court has examined sua sponte, that Judge Sage and I were both present in the circuit court on the day when the order refusing the appeal was entered; but I was there for the purpose of sentencing two convicted persons, and took no part in the order, as the indorsement of the original order shows.

All the other grounds urged for a rehearing on behalf of cross complainants, except one, have been so fully considered in the opinion already filed that we think it unnecessary to refer to them, except to say that nothing now presented leads us to change our views of them, as already expressed. One contention of counsel for the cross complainants did escape notice in our opinion, because

of the many more formidable ones we felt it necessary to consider at length. As it has been repeated in the petition for rehearing, it is only proper that we should now refer to it. The contention is that although Maria Bigelow, the life tenant, died in August, 1860, and the claimants had an immediate right of entry into the lands in suit, as the owners of the remainder, there was so much doubt whether claimants were entitled, as remainder-men, or the direct descendants of William Barr, Sr., and his sons-in-law, were thus entitled, that the running of the statute was suspended until 1868, when the decision of the supreme court of the United States in favor of the descendants of William Barr, Sr.'s, brothers and sisters made it clear that the claimants and their coheirs had an interest in the property, and therefore that the period of limitation did not expire until 1889, three years after the bringing of this action. This proposition, which to the court is somewhat startling, is sought to be supported on the authority of New Orleans v. Gaines, 15 Wall. 634; Fortune v. Center, 2 Ohio St. 537; and Trustees v. Campbell, 16 Ohio St. 11. The first case involved the question how many years of rents and profits Myra Clark Gaines was entitled to recover from the city of New Orleans on the land withheld from her. It was held that certain limitations of the Civil Code of Louisiana upon the time within which actions for rent and personal actions might be brought did not apply to a claim for rents and profits of land, the title to which was in dispute between the plaintiff and defendant, and that really no cause of action arose for rents and profits until the main suit, as to the title, was determined. Whether this case turned on the peculiar provisions of the Louisiana Code, or not, it is not necessary to determine. It suffices to say that the case has no possible application here. The action which claimants failed here to bring was the main action to assert and determine the title, and the suit of Poor v. Considine did not in the slightest degree interfere with their bringing such a suit. The question of law decided in Poor v. Considine was, of course, of interest to them, in supporting their claim of title; but it is a novel doctrine that claimants of land, out of possession, may silently delay asserting their claims until somebody else may by his suit have secured from the court of last resort the decision of a doubtful question of law, upon which the validity of their title depends. The case of Fortune v. Center, 2 Ohio St. 537, has nothing in it in the remotest degree sustaining such a proposition. In fact, the court did not refer to the statute of limitations, because it was not involved in the case. In the case of Trustees v. Campbell, 16 Ohio St. 11, the point decided was that a general statute of limitation for suits for trespass did not apply to a suit begun under a special statute authorizing such a suit for trespass on lands held in trust by the state. The aid that this case gives to the proposition of counsel does not appear.

The counsel for the complainants also files a petition for rehearing. The chief ground urged in this petition is that the decree appealed from was entered upon August 8, 1894, in the circuit court,

while the case was docketed in this court and the transcript filed here on July 24, 1894, at a time when the cause was not in condition to permit appeal. Therefore it is urged that this court never had jurisdiction to review the decree which by its order is now reversed. The discrepancy thus stated arises merely from a misprision of the then clerk of this court, in marking upon the appearance docket the wrong date for the filing of the transcript. It appears that the record in the court below was so voluminous, and both appellants and appellees were so anxious to have the cause speedily heard and decided in this court, that they made an arrangement with the clerk of this court to have large parts of the record printed under his supervision before the final decree was formally entered and the appeal was taken, and that an early number upon the docket was held open by the clerk for this case, and the date of the docketing was thus by mistake marked before any appeal had been taken, and before any return had been in fact made. The record shows that the appeal was taken August 15, 1894, and the certificate of the circuit clerk to the return of the transcript to the appeal is dated October 1, 1895. These dates are contained in the properly certified original record on file in this cause. The evidence conclusively establishes that the return to the appeal was not filed in this court until October 9, 1894. Immediately after the docketing of the case and filing of the transcript, counsel for appellees appeared, and filed motions to dismiss on other grounds, and, on the overruling of these, filed their briefs upon the merits. Such acts would seem to constitute a waiver of any irregularity in the docketing of the cause, if that were essential. In order to make the record speak the truth, however, we think it proper to make an order by which it shall be made to appear upon the docket of this court that the return and transcript were, as a fact, lodged in this court on October 9th, and not upon July 24th, as the docket incorrectly states. This petition also reviews some of the alleged errors of this court in the opinion already filed. We carefully read the entire record and the briefs of counsel, and gave this case the full consideration that its intrinsic importance, and the fact that we were reversing the action of two learned and able judges, required, and are entirely satisfied of the correctness of our conclusions. This leads us to deny the motion made by counsel for cross complainants that we certify certain questions arising in the case to the supreme court. If there ever was a case which should be ended, this is the case.

A motion is also made that we modify the order of reversal already made, so as to save the rights of those claimants who brought suit in the common pleas court in 1881. We should be glad to make an exception in the order which should relieve those claimants of any embarrassment that this order and adjudication ought not rightfully to impose upon them. But we do not see how any exception can safely be made, with the data before us. Nor do we think its absence will cause unjust embarrassment to cross complainants. We have ordered the bills and cross bills dismissed on

the merits of the defense of the statute of limitations. In so far as we have here determined that adverse possession began against all the claimants on August 3, 1860, and continued until 1886, it would seem that such a finding should hereafter estop all parties to this suit from raising the question in any suit pending. The bringing of the suits in 1881 did not save the bar of the statute in this suit, whatever effect it had in the suits in the state court, and we have not passed on the effect of it on those suits, because not within our jurisdiction. Every court called upon to consider the effect of our order and adjudication upon those suits will be advised that the fact of the bringing of those suits was immaterial in this suit, to save the bar of the statute, and will measure and limit the estoppel of our decree on the merits by that knowledge; but we cannot safely undertake, by exceptions to our decree on the merits, to limit with exactness the estoppel which other courts shall ascribe to it, when other circumstances, material and relevant to the issue before them, are presented, which were wholly immaterial in the determining of the issue before us. The motion to modify the order of reversal heretofore made is denied.