PARKER v. SINCLAIR.

No. 5155.

Court of Appeals of the District of Columbia.

Argued May 2, 1932.

Decided June 6, 1932.

Motion for Second Rehearing Denied July 11, 1932.

Chester I. Long and Peter Q. Nyce, both of Washington, D. C., for appellant.

Challen B. Ellis, of Washington, D. C., and R. W. Ragland and Grattan T. Stanford, both of New York City, for appellee.

Before ROBB, VAN ORSDEL, HITZ, and GRONER, Associate Justices.

VAN ORSDEL, Associate Justice.

Appellant, plaintiff below, filed a bill in equity seeking an accounting with defendant, Harry F. Sinclair, in relation to certain oil land transactions in the state of Wyoming. From a decree dismissing the bill, this appeal was taken.

It appears from the record that in 1890 eight qualified citizens, Russell J. Straight, Daniel B. Dorsett, Charles P. Collins, Philip M. Shannon, Frank H. Murdock, Gideon H. Strong, Irving M. Shannon, and George B. McCalmont, arranged with Philip M. Shannon, one of their number, to go to Wyoming and locate under the then mining laws certain oil and gas lands situated in the Salt Creek oil field. Original location notices were duly posted on the lands here in controversy. Exact copies of these notices were filed for record in the mining records of the Casper Mountain mining district, and also in the mining records of Natrona county, Wyo. In

August, 1892, Dorsett died intestate, leaving heirs at law who have never been residents of Wyoming.

The theory of the bill is to the effect that after the claims were staked in 1890 the cotenant Shannon had constructive possession of the property for the benefit of all his cotenants in common. We think this claim is sustained by the record, since Shannon did everything required by law in the way of assessment work and otherwise to keep the title to the claims intact in the original locators.

On October 10, 1904, Philip M. Shannon, acting under a power of attorney representing all of the original locators excepting Dorsett and the Dorsett heirs, conveyed "all interest" in the lands in question to one Joseph H. Lobell, who formed the "Societe Belgo Americiane des Petroles du Wyoming" Corporation, known as the Belgo Company, to which Lobell quitclaimed his interest in the mining claims.

The assessment work and necessary expenditure to preserve the legal status of the claims was performed from time to time between 1904 and 1919. The affidavits of annual expenditure set forth that the work was performed and the expenditure made by one Waltman as the "agent of the owners of the placer mining claims," and that the work was done "on behalf of said owners and at their cost."

The title to the lands in question was further perfected by discovery of oil during the month of September, 1917. Affidavits declaring such discovery were filed by H. C. Bretschneider as agent of the owners of the mining claims in the office of the register of deeds of Natrona county, Wyo.

It is averred, in substance, that on June 4, 1920 (41 Stat. 812) the Naval Appropriation Act was passed; that under this act Albert B. Fall, Secretary of the Interior, leased to the Mammoth Oil Company, a corporation created by defendant, Sinclair, for this purpose, a part of Naval Reserve No. 3, or more particularly the portion known as Teapot Dome, in which the lands in question were located. It is also averred that pursuant to a previous understanding Sinclair, on February 3, 1922, made a written proposal to Secretary Fall in which he agreed that, if the lease was granted to him, he would quiet all outstanding claimants' titles in the lands to be embraced within the lease.

In compliance with his agreement, defendant, on March 10, 1922, caused the Mammoth

Company to enter into an agreement with the Belgo Company and an associated company called the Pioneer Company, wherein he agreed to pay them $1,000,000 for all their right, title, and interest in the mining claims in the reserve, conditioned, however, on his securing the lease in question to Teapot Dome. Pursuant to this agreement, a quitclaim deed was given by the Belgo Company conveying all its interest in the claims to the Mammoth Company.

On March 11, 1922, defendant, Sinclair, deposited with Secretary Fall the quitclaim deed secured from the Belgo and Pioneer Companies, which was accepted by Fall as a complete compliance with the agreement of defendant as a condition precedent to securing the Teapot Dome lease. The Mammoth Company on the following day gave a quitclaim deed conveying its interests to the United States. Accordingly, on April 7, 1922, having first procured the signature of the Secretary of the Navy, Fall executed the lease to the Mammoth Company.

On March 10, 1921, the Dorsett heirs conveyed all their right, title, and interest in the mining claims in question, to one Marion N. Wheeler, a partner of plaintiff, Parker, for a consideration in excess of $70,000. Parker, it is alleged, advanced $35,000 of the amount. Wheeler, on March 8, 1924, conveyed his interest in the rights acquired from the Dorsett heirs, to the plaintiff.

It is also averred, in substance, that Sinclair owned the stock in the Mammoth Company, a large part of which he sold on the strength of the lease acquired from Fall, receiving therefor many millions of dollars. It is sought in this action to have a constructive trust declared in this fund in favor of the plaintiff, and an accounting to determine the interest of plaintiff therein.

█ It is conceded that neither Daniel B. Dorsett nor his heirs ever executed any conveyance of their interest in the claims in question until the conveyance to Wheeler on March 10, 1921. Notwithstanding this concession, we are of the opinion that the case turns on the conveyance to Lobell of October 10, 1904. In that conveyance Shannon, on behalf of the seven original cotenants of Dorsett, conveyed to Lobell "all interest" in those lands. It thus appears that from 1904 to 1922, when the Belgo Company, through the Mammoth Oil Company, relinquished its title to the United States, it was in uninterrupted possession, developing and operating the mining claims in question. This posses-

sion was based upon recorded conveyances purporting on their face to pass the title derived by Lobell from Shannon. We think the conclusion is unavoidable that, notwithstanding the infirmity in the 1904 deed, in so far as it was ineffective to convey the interest of the Dorsett heirs, it gave color of title by purporting to convey the entire interest in the property, which was thereafter continuously sustained by the uninterrupted and hostile possession of the whole property by Lobell and his successors.

█ We are not unmindful of the rule which prohibits a cotenant from acquiring or asserting adverse title against his cotenants because of the mutual relations of trust and confidence which the law recognizes as existing between them, but that rule is confined chiefly to a cotenancy accruing at the same time and under a common title. Here the interests of the cotenants accrued at different times. The cotenancy, if such it may be called, between the Dorsett heirs and Lobell, accrued in 1904, and as to the successors of Lobell at later dates. Not only did the interests accrue at different times, but under different instruments. Neither can the rule be invoked forbidding a cotenant to acquire title against his fellow cotenant through superior means of information which he may possess and which are not available to his associate, since the means of information respecting the state of the title in the present case was matter of record and equally open and available to all the parties in interest.

We think the facts here are so closely analogous to those in the case of Hodgson v. Federal Oil & Development Company, 274 U. S. 15, 47 S. Ct. 502, 503, 71 L. Ed. 901, 54 A. L. R. 869, that the decision is controlling. There the court, speaking through Mr. Justice McReynolds, said:

"The rule as commonly stated forbids a cotenant from acquiring and asserting an adverse title against his companions because of the mutual trust and confidence supposed to exist; but the rule does not go beyond the reason which supports it. If the interests of the cotenants accrue at different times, under different instruments, and neither has superior means of information respecting the state of the title, then either, unless he employs his cotenancy to secure an advantage, may acquire and assert a superior outstanding title, especially where there is no joint possession. This exception to the general rule is recognized in Turner v. Sawyer, 150 U. S. 578, 586, 14 S. Ct. 192, 37 L. Ed. 1189; Elder v. McClaskey (C. C. A.) 70 F. 529,

546; Freeman on Cotenancy and Partition, § 155; Shelby v. Rhodes, 105 Miss. 255, 267, 62 So. 232, Ann. Cas. 1916D, 1306; Sands v. Davis, 40 Mich. 14, 18; Joyce v. Dyer, 189 Mass. 64, 67, 75 N. E. 81, 109 Am. St. Rep. 603; Steele v. Steele, 220 Ill. 318, 323, 77 N. E. 232. We know of no opinion by the courts of Wyoming to the contrary.

'The bill shows that the Oil & Development Company and its predecessors were in uninterrupted possession of the mining claim from 1905 to August 21, 1920, when it relinquished the same to the United States and applied for the lease; that throughout this period they held under assertion of right based on recorded conveyances purporting to pass the whole claim to them (which undoubtedly gave color of title) and did whatever was necessary to preserve it. There is no suggestion that any of them acknowledged the title was other than what these conveyances purported to pass or recognized the heirs of McManus as co-owners. Such holding must be regarded as exclusive and hostile to all others and not in any relationship of trust and confidence. It continued for fifteen years, during which the McManus heirs asserted no conflicting right or objection. They do not appear to have been infants or under disability. In no admissible view of the leasing act are they shown to have been entitled to the lease or any interest therein."

■ We think that the mere fact that the conveyances following the 1904 conveyance to Lobell were deeds in which the vendors merely quitclaimed their interest in the property in question is of no importance, since the interest which Lobell acquired under the 1904 deed purported to convey "all interest" in the claims, hence whatever Lobell acquired passed to his successors in interest under the respective quitclaim deeds.

■ Conceding, as contended by counsel for appellant, that the Dorsett heirs were not divested of their title by the 1904 conveyance, and assuming that the relation of cotenancy continued between them and Lobell and his successors, we think that the long-undisturbed possession exercised by Lobell and his successors in interest after 1904 was so open and notorious in its hostility and exclusiveness as to put the Dorsett heirs on notice. This case comes well within the rule that, where one cotenant in common takes exclusive possession of the entire property, improving and developing it, receiving the rents, income, and profits thereof, without an accounting or any demand upon him for one, the ouster is complete. 38 Cyc. 32. As was said by Mr. Justice Shepard in the case of Morris v. Wheat, 11 App. D. C. 201, 219: "Unquestionably one tenant in common may oust his cotenants and claim the title to the whole adversely. But to constitute an adverse possession in such a case the evidence must show some distinct facts tending to bring notice of the same home to the cotenants."

■ Admitting that the foundation for the operation of the statute of limitations in a case of this kind must be clear and positive, and that there must be a continuous disclaimer and disavowal of title and assertion of an adverse right with notice to the party against whom the claim operates, such a foundation is clearly disclosed by the facts in this case. Notice need not be actual, verbal, or written; it may be inferred from a hostile or unequivocal possession or from acts or records which ordinarily constitute constructive notice. By the execution and registration of the deed of 1904, the Dorsett heirs were put upon notice that an adverse title was thereby asserted which disclaimed and disavowed any title whatsoever in them. The property had been in the continuous possession of, and worked by, the trustee Shannon and his successors in title and possession, Lobell and the Belgo Company, for more than the ten-year limitation prescribed by the Wyoming statute, and no attempt was made on the part of the heirs of Dorsett to exercise their right of entry. A hostile title was asserted in the deed to Lobell. Parker v. Sinclair (C. C. A.) 25 F.(2d) 570. The adverse possession of Lobell and his successors was of a character sufficient to estop the Dorsett heirs or their grantees from now asserting title.

The decree is affirmed, with costs.